GRIFFIN et al.

v.

TWIN VALLEY PSYCHIATRIC SYSTEMS.

2002-Ohio-3234.]

Court of Claims of Ohio.

No. 2001–01809.

Decided June 5, 2002.

302

Gerald S. Leeseberg, for plaintiffs Myers, Campolito, Canter, Stevens, and the Stantons.

Michael J. Rourke, for plaintiff Griffin.

Thomas W. Trimble, for plaintiff Bope/Stevens.

Betty D. Montgomery, Attorney General, Eric A. Walker, Susan M. Sullivan and Anne Berry Strait, Assistant Attorneys General, for defendant.

---

RICHARD M. MARKUS, Judge.

{¶ 1} This matter came before this court for a bench trial on the defendant psychiatric hospital's liability for multiple murders and other violent harm that a former adult patient (Jerry Hessler) caused on November 19, 1995, four months after the hospital discharged him on July 20, 1995. The plaintiffs claim that the defendant hospital negligently discharged that patient and that its negligent discharge proximately caused the former patient's violent acts. At the trial, the plaintiffs withdrew any claim that the hospital failed to warn potential victims and offered no evidence to support such a claim.

{¶ 2} Eighteen witnesses testified in court, nine additional witnesses testified by deposition, and the parties offered voluminous exhibit evidence. The court received frequently conflicting opinion testimony from five psychiatrists, six psychologists, and seven licensed social workers. It now makes the following factual findings and legal conclusions:

## ORIGINAL COMMITMENT PROCEEDINGS

{¶ 3} 1. On May 10, 1995, Carlene Hessler (the patient's mother) consulted Pamela Creycraft, a Licensed Independent Social Worker at the Columbus Area Community Mental Health Center ("CACMHC") regarding her son's violent activities toward her and others.

{¶ 4} 2. As a Probate Prescreen Clinician, Creycraft interviewed and evaluated the patient on May 11, and recommended his psychiatric hospitalization. She also arranged for the patient's examination by Dr. Basobas, the CACMHC's admitting psychiatrist.

{¶ 5} 3. With Creycraft's assistance, the patient's mother promptly initiated proceedings in the Franklin County Probate Court for her son's involuntary commitment, using a form affidavit that contained statutory commitment allegations that her son:

{¶ 6} "Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior or evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm.

{¶ 7} "Would benefit from treatment in a hospital for his mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or himself."

{¶ 8} 4. The mother's responses to the probate court questionnaire reported that her son had a lengthy history of psychiatric treatment, including three prior in-patient hospitalizations beginning in 1983.

{¶ 9} 5. Collectively, these documents reported that the patient had recently (a) assaulted his mother and damaged her home, (b) possessed multiple firearms, (c) threatened his brother with a handgun, (d) stalked a former girlfriend, (e) threatened to kill that former girlfriend and her husband, and (f) claimed that he had been outside their home with a gun ready to kill them.

{¶ 10} 6. Apparently relying on Creycraft's detailed report and the mother's affidavit with detailed questionnaire responses, the probate court referee issued a temporary order of detention on May 11. That order directed the Franklin County Sheriff to take the patient into custody forthwith and "to transport him to Franklin County Alcohol, Drug Addiction and Mental Health Services [ADAMH] Board and/or Columbus Area Mental Health Ctr. [CACMHC] and/or Central Ohio Psychiatric Hospital [COPH, now known as the defendant Twin Valley Psychiatric Systems] then and there to abide the order of this Court in the premises."

{¶ 11} 7. At the same time, the probate court scheduled a hearing on Jerry Hessler's involuntary commitment at the defendant hospital on May 17, 1995, appointed counsel to represent him, designated Dr. Robert Turton as a "Court doctor" to examine him, and directed that the patient receive written notice of his rights.

{¶ 12} 8. The sheriff delivered the patient to the defendant hospital in the late evening hours of May 11, where an attending psychiatrist (Dr. Padma Tandon) evaluated him and admitted him in the early morning hours of May 12.

{¶ 13} 9. During the patient's admission, hospital personnel received and reviewed probate court materials for this patient, including Creycrafts' detailed prescreen intake and progress reports, the CACMHC psychiatrist's and social worker's reports, photographs of damage the patient caused to his mother's home, and a probate "pickup" form that stated that the patient may present a dangerous situation because he may have guns.

{¶ 14} 10. After Dr. Turton interviewed and evaluated the patient on May 16, a probate court referee conducted the scheduled hearing on May 17. The referee found by clear and convincing evidence that the patient was "a mentally ill person subject to hospitalization by Court order as defined by Ohio R.C.

Section 5122.01(B) 2, 3, & 4" for which "the least restrictive alternative available consistent with treatment goals is inpatient hospitalization."

{¶ 15} 11. Those statutory sections define the conditions which permit the probate court to commit a patient for involuntary hospitalization:

{¶ 16} "5122.01(B) 'Mentally ill person subject to hospitalization by court order' means a mentally ill person who, because of the person's illness:

{¶ 17} "(1) Represents a *substantial risk of physical harm to self* as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;

{¶ 18} "(2) Represents *a substantial risk of physical harm to others* as manifested by evidence of *recent* homicidal or other violent behavior, evidence of *recent* threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of *present* dangerousness;

{¶ 19} "(3) Represents a substantial and immediate risk of *serious physical impairment or injury to self* as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community; or

{¶ 20} "(4) Would benefit from treatment in a hospital for his mental illness and is in need of such treatment as manifested by evidence of behavior that creates a *grave and imminent risk to substantial rights of others* or himself." (Emphasis added.)

{¶ 21} 12. The probate court referee issued a judicial entry of commitment that ordered the patient "committed for a period not to exceed 90 days to" the Franklin County ADAMH Board with "placement at COPH [the defendant hospital]." Apparently no one filed an objection to the referee's order, which remained as the court's order pursuant to R.C. 5122.15(J).

## IN–PATIENT HOSPITALIZATION

{¶ 22} 13. Jerry Hessler remained a patient at the defendant hospital almost ten weeks from May 12, 1995, until July 20, 1995, when the hospital discharged him for further outpatient aftercare.

{¶ 23} 14. During the 69 days that the patient remained under the defendant hospital's direct supervision, his hospital treatment team included a psychiatrist (Dr. Padma Tandon), a psychologist (Sharda Mehta), a social worker (Eydie LeDay–Smith), a group psychotherapist (Bryce Sullivan), an activity therapist (Dianne Sprague), and nursing personnel.

{¶ 24}  15. During his hospitalization there, his attending psychiatrist reviewed his earlier in-patient record for that hospital, which summarized records for his in-patient psychiatric treatment at two other hospitals.

{¶ 25}  16. During the first two weeks of his admission to the defendant hospital, its staff conducted a psychiatric examination, a psychological evaluation, a social work assessment, a nursing assessment, and an adjunctive therapy assessment. The attending psychiatrist and the other members of his treatment team fully appreciated that he was dangerous when he was admitted. They prepared a treatment plan with a stated goal: "Patient will be able to control the explosive outbursts and will no longer be threatening."

{¶ 26}  17. The hospital treatment team initially accepted the provisional diagnosis they received from the CACMHC psychiatrist (Dr. Basobas) of a bipolar disorder, as a "working diagnosis" until hospital personnel could arrive at their own diagnosis. In due course, the hospital's attending psychiatrist diagnosed his condition as a delusional mental disease with an intermittent explosive personality disorder.

{¶ 27}  18. Mental diseases like a delusional or bipolar disorder are often treatable and controllable with medication, even though they remain uncured. Personality disorders like an explosive personality are often deeply ingrained and less treatable with medication. Long-term psychological counseling can help to reduce but may never eliminate some personality disorders.

## POST–DISCHARGE AFTERCARE ASSIGNMENT PLANS

{¶ 28}  19. Within a few days after the patient's admission to the defendant hospital and many weeks before his discharge from that hospital, the Netcare Agency acted as the ADAMH Board's duly authorized agent to determine that the North Community Counseling Center (NCCC, also known as the "Bridge") would provide this patient's outpatient aftercare with a designated case manager, following his eventual discharge from that hospital.

{¶ 29}  20. On May 22, 1995, ten days after his admission to the defendant hospital and fifty-nine days before his discharge, a Bridge social worker (John Paree) interviewed the patient and reviewed his records to initiate procedures for the patient's eventual release to the Bridge's out-patient care.

{¶ 30}  21. The Bridge assigned Lisa Johnson as the Bridge's case manager for this patient. She first met with the patient at the defendant hospital on June 1, 1995, seven weeks before his discharge. Thereafter, she repeatedly met with the patient, participated in regular meetings with his hospital treatment team, had complete access to his records, made entries on those hospital records, and copied a portion of those records for her use in aftercare duties. She was fully

aware of his violent history. She believed he was dangerous and expressed fear about her prospective service as his case manager.

{¶ 31} 22. The hospital's attending psychiatrist (Dr. Padma Tandon) asked the Bridge's case manager (Lisa Johnson) to request that Netcare assign this patient to a "community treatment team" (CTT) for his aftercare services, which could provide a higher level of case management services. On June 16, 1995, in response to that request, Netcare's evaluator (Ed Plihall) concluded that a traditional aftercare program with a single case manager would meet this patient's community mental health needs after his discharge. His supervisor (Tom Fuller) reviewed and approved that decision.

{¶ 32} 23. Contrary to plaintiffs' contention, the defendant hospital satisfied its duty regarding the attending psychiatrist's preference for aftercare by a "community treatment team" (CTT) by asking the Bridge's aftercare case manager to request Netcare's reconsideration.

{¶ 33} 24. The plaintiffs argue that sections 3.10.1, 3.10.2, 8.1.1, and 8.1.1.2 of the hospital's Unified Services Agreement with the Franklin County ADAMH Board gave the hospital a right and duty to appeal from any adverse decision about aftercare and ultimately to impose its own requirements for any community-based aftercare.

{¶ 34} 25. With its addenda, nine agencies approved this comprehensive agreement: the Ohio Department of Mental Health, the Franklin County ADAMH Board, the defendant hospital, Netcare, CACMHC, and four other outpatient treatment facilities. The Unified Services Agreement contained the following provisions. Note: All emphasis appears in the original. The bracketed names are added:

{¶ 35} "3.10.1. Procedural Dispute Process

{¶ 36} "3.10.1.1 The [ADAMH] Board designee [Netcare] and the Hospital's Managed Care Director [Jeffrey Hill] will initially communicate with each other to attempt to resolve the dispute.

{¶ 37} "3.10.1.2 If resolution is not achieved, the matter will be referred to the Chief Executive Officer of the Hospital and the Director of the [ADAMH] Board.

{¶ 38} "3.10.1.4 [After a mediation procedure described in section 1.10.1.3].
* * *

{¶ 39} *If an agreement cannot be reached, the final decision shall be made by the Hospital CEO for matters concerning hospital operations, and by the [ADAMH] Board Executive director for matters concerning community based programming.*

{¶ 40}  "3.10.2. Clinical and Discharge Plan Dispute Process

{¶ 41}  "3.10.2.1 The [ADAMH] Board CCO or designee and the Hospital attending physician [Dr. Tandon] will initially communicate with each other to attempt to resolve the dispute.

{¶ 42}  "3.10.2.2.2 If resolution is not achieved the Hospital CCO and [ADAMH] Board or designee will attempt to resolve the matter within three (3) working days.

{¶ 43}  "3.10.2.3 If the Hospital CCO and Board CCO or designee disagree over any treatment aspect of a resident both parties agree to seek consultation of a third party.  * * * *If disagreement remains, the Hospital CCO or designee will make the final decision.*

{¶ 44}  "3.10.3 The Hospital acknowledges the right of the [ADAMH] Board to grieve to the ODMH [Ohio Department of Mental Health] any matter disputed under this Section.

{¶ 45}  "8.1.1.1 All parties further agree to recognize and abide by the discharge criteria, date, and plan written on the Hospital treatment plan.

{¶ 46}  "8.1.1.2 If any party to this agreement disagrees with the discharge criteria, data, and/or the discharge plan, the responsible parties agree to confer and attempt to resolve the differences.  If agreement cannot be reach, the matter will be resolved pursuant to the dispute resolution process outlined in section 3.10 of this Agreement."

{¶ 47}  26.  The overall import of the United Services Agreement clearly gives the ADAMH Board paramount authority and responsibility for mental patient care, subject to the hospital's authority and responsibility for in-patient care of hospital residents.  See, also, R.C. 340.02(A)(3); 5119.06(A)(1); *Clermont Cty. ADAMH Bd. v. Hogan* (1997), 79 Ohio St.3d 358, 681 N.E.2d 1322.  Reading the document in its entirety, this court finds that it unambiguously provides that (a) the hospital has primary authority over decisions regarding in-patient care for its residents;  (b) the ADAMH Board has primary authority over a patient's assignment for community-based aftercare;  (c) the agency to which the ADAMH Board assigns a patient's community-based aftercare has primary authority over decisions regarding out-patient aftercare treatment;  (d) the ADAMH Board or its designees can challenge any hospital's or agency's treatment decisions;  (e) if the ADAMH Board and the hospital cannot resolve their disagreement with mediation assistance, the hospital retains control over in-patient treatment decisions, subject to the ADAMH Board's right to appeal to the ODMH;  (f) if the ADAMH Board and the aftercare agency cannot resolve their disagreement with mediation assistance, the aftercare agency may have no comparable right to appeal to the ODMH.

{¶ 48} 27. In this case, the probate court committed this patient to "the Franklin County ADAMH Board with placement at COPH [the defendant hospital]." It is doubtful that the agreement between the ADAMH Board and the hospital contravenes or supersedes the controlling court order, which gave the ADAMH Board authority for the patient's placement and relocation, R.C. 5122.15(C)(4), and responsibility to "place the respondent [patient] in the least restrictive environment available consistent with treatment goals." R.C. 5122.15(F).

{¶ 49} 28. If the United Services Agreement is ambiguous, the court finds the same meaning from evidence about the parties' intentions and about their conduct under the agreement. There was no evidence that the hospital ever insisted on its own preferences for community-based aftercare assignment or treatment.

{¶ 50} 29. Even if the hospital should have challenged Netcare's placement, no reliable evidence showed (a) how the ADAMH Board would have responded to that complaint, or (b) whether a reasonable hospital would have refused to accept the ADAMH Board's ultimate decision about this patient's aftercare placement. The hospital and the ADAMH Board both relied on Netcare for any aftercare decision because Netcare was presumably better equipped to make that decision, particularly when it both considered and reconsidered the patient's aftercare placement.

{¶ 51} 30. If the hospital had authority to control out-patient aftercare treatment, subject to the ADAMH Board's grievance to the ODMH, no evidence showed whether ADAMH Board would have asserted that grievance, and whether the ODMH would have rejected the ADAMH Board's grievance on that issue. Further, the Bridge could have implemented or abandoned "community treatment team" care for this patient if it believed that decision was appropriate, regardless of the defendant hospital's previously expressed preference.

{¶ 52} 31. In other words, the plaintiffs failed to show by a preponderance of the evidence that the hospital had the duty or ability to insist on any aftercare placement or treatment, or that it would have ultimately prevailed if it had any such duty and right.

## IN–PATIENT PROGRESS

{¶ 53} 32. Throughout his hospital stay, this patient's treatment team continually stressed the importance of his taking his medication. They reminded him almost daily about his need to take his medication. He was cooperative and took his medications without complaint. He told his psychiatrist that he felt comfortable on the anti-psychotic medication she prescribed to control his delusional

disorder. He assured his treatment team and his prospective aftercare case manager that he would take his medications after his discharge.

{¶ 54} 33. On June 21, 1995, he began a self-medication program, and he remained on that program until his discharge. On July 12, 1995, his nurse noted that he was taking his medications properly on the self-medication program.

{¶ 55} 34. Nevertheless, his past medical records of noncompliance and his comments that he did not need the medication caused the hospital treatment team and the prospective aftercare case manager to doubt that he would maintain his medication treatment after his discharge without appropriate supervision. They anticipated that he would probably "decompensate" or renew his mental illness symptoms if he failed to take his prescribed medication, even though he was reportedly nonviolent without any medication for many years after he developed that illness.

{¶ 56} 35. During his hospital stay, he became more cooperative with other forms of therapy. On June 14, he apologized to both his psychiatrist and psychologist for his behavior. He began to talk more about his feelings. On June 28, he agreed to individual psychological counseling twice weekly. On July 17, the psychologist noted that she had been having daily contact with him.

{¶ 57} 36. The attending psychiatrist saw this patient and made notes in his chart twenty times during his ten-week stay there. She and other treatment team members noted his improvement on his hospital records.

{¶ 58} 37. During his hospitalization, the defendant hospital's personnel adequately assessed his risk of violence according to standards of care applicable then, which did not rely on any formal risk assessment checklist but depended upon clinical interviews with knowledge of his violent history.

{¶ 59} 38. Before his discharge, hospital personnel made appropriate arrangements to reduce risk-provoking factors by (a) directing the Bridge's aftercare case manager to provide designated medication, and psychiatric and psychological care; (b) confirming his employment immediately after his discharge; (c) confirming his housing away from his previously contentious home environment; and (d) confirming that all weapons had been removed from his home.

{¶ 60} 39. During the latter part of his care there, the attending psychiatrist occasionally granted him off-grounds or "leaves of absence" privileges, which permitted him to travel away from the hospital without supervision for several hours. He always returned without any intervening violent activity.

{¶ 61} 40. On one occasion, the patient returned to the hospital angry, after he made an unauthorized visit to his mother, where he found that she had packed up his belongings. However, he was able to control his anger. Four days later,

he apologized to the attending psychiatrist for his behavior and shared with her his depressed feelings from having unfavorable relations with his family.

{¶ 62} 41. On another occasion, the patient's mother called the hospital to report that he was running late because he missed his bus. The hospital staff extended his off-grounds pass to 11:30 p.m., and he returned at 11:40 p.m. On that occasion, he brought back caffeine pills. When the attending psychiatrist advised against his use of those pills, he said he did not know they could be harmful.

{¶ 63} 42. In-patient psychiatric hospitals ordinarily serve to stabilize dangerous patients so they are no longer imminently dangerous. Psychiatric hospitals usually lack personnel and resources to provide long-term supervision for potentially dangerous patients who no longer present an immediate or imminent threat of violence. Community out-patient aftercare facilities should provide prolonged supervision and treatment for mentally ill persons who may later become a potential danger to themselves or others. As discussed below, hospitals lack legal authority to retain involuntary in-patients beyond time limits established by the probate court pursuant to statutory restrictions.

## DISCHARGE TO THE AFTERCARE AGENCY

{¶ 64} 43. The hospital's attending psychiatrist tentatively planned to discharge this patient on July 12, 1995. The patient was clinically stable and was no longer imminently dangerous by July 12, 1995, when the hospital personnel initially planned his discharge. They delayed his discharge to facilitate further post-discharge arrangements. The Bridge's aftercare case manager disagreed with his discharge on July 12 because he displayed nonviolent anger when the attending psychiatrist told him she would delay his discharge.

{¶ 65} 44. On July 12, 1995, the attending psychiatrist believed that the patient was no longer a "mentally ill person subject to hospitalization by court order" as defined by R.C. 5122.02(B). Accordingly, at the patient's request, the defendant hospital accepted the patient's voluntarily admission there in lieu of his involuntary admission, pursuant to R.C. 5122.02 and 5122.15(G). The plaintiffs offered no persuasive expert evidence that disagreed with the defendant hospital's decision to accept him then as a voluntarily admitted patient.

{¶ 66} 45. The ADAMH Board and the hospital would lose any legal authority to retain him as an involuntary hospital patient on August 15, 1995 (ninety days after his commitment), unless (a) on or before August 5, 1995, they requested the probate court to extend his commitment, and (b) the probate court conducted a new hearing and made a new finding by clear and convincing

evidence that he was then a "mentally ill person subject to hospitalization by court order," pursuant to R.C. 5122.02(B) and 5122.15(H).

{¶ 67} 46. As a voluntary admission patient, the hospital retained authority to deny any discharge he might request for three days, while its personnel sought further probate court authority to retain him pursuant to R.C. 5122.03(B). This patient repeatedly expressed his desire to obtain his discharge, and he apparently understood his legal rights. He probably would have formally requested his discharge on or about July 20, 1995, if the hospital had not discharged him then.

{¶ 68} 47. No evidence showed that a probate court judge or referee would probably make the necessary findings or provide the resulting order (a) to extend this patient's involuntary commitment beyond August 15, 1995, or (b) to deny any request he might make for his discharge as a voluntary patient on or after July 12, 1995.

{¶ 69} 48. The probate court's required findings for continued commitment then were unlikely when the attending psychiatrist and other highly skilled professionals believed that the patient no longer met the definitions in R.C. 5122.02(B) for a "mentally ill person subject to hospitalization by court order." Compare *Whiting v. Ohio Dept. of Mental Health* (Aug. 29, 2000), Court of Claims No. 96–07630, affirmed (2001), 141 Ohio App.3d 198, 750 N.E.2d 644.

{¶ 70} 49. The change of the patient's status from an involuntary admission to a voluntary admission required the probate court to dismiss its case and terminate its commitment order, though it did not journalize that order until November 28, 1995. R.C. 5122.15(F)(2).

{¶ 71} 50. After his discharge from the defendant hospital, any person could seek a probate court order for his immediate detention and his subsequent involuntary hospitalization pursuant to R.C. 5122.11 and 5122.15 if he again satisfied involuntary commitment requirements.

{¶ 72} 51. On Thursday, July 20, 1995, the defendant hospital discharged this patient for follow-up supervision and aftercare by the Bridge. At that time, his mental illness was in remission, and he was regularly taking the prescribed medications. In the earlier part of his hospitalization, he had been angry, threatening, moody, and unresponsive. He became more open in group therapy, less threatening, and he was nonviolent for his entire ten-week stay. His relationship with his mother improved. She had a pleasant visit with him at the hospital, where he allowed her to hug him. He made no attempt to leave the hospital without permission, and he returned from absences with leave at or near the time he was due back. All members of his hospital treatment team agreed with the decision to discharge him on July 20, 1995.

{¶ 73}   52.   At the time of his discharge, the hospital had a detailed discharge and aftercare plan, which it implemented and communicated to the assigned aftercare case manager.   The patient had a job, an acceptable place to reside, suitable transportation, and a supportive family.   He received a thirty-day supply of his prescribed medications and directions to report to his assigned aftercare case manager on the same day.   He agreed to comply with the hospital's aftercare plan.   He manifested no violent signs then.

{¶ 74}   53.   The plaintiffs failed to show by a preponderance of the evidence that the defendant hospital acted negligently (a) by discharging the patient then, (b) in preparing or implementing its discharge plan, or (c) in providing the aftercare agency with appropriate information.

{¶ 75}   54.   Further, the plaintiffs failed to show by a preponderance of the evidence that the hospital's conduct in discharging the patient then, or in preparing or implementing its discharge plan, or in providing the aftercare agency any related information, proximately caused the patient's violent acts four months later.   Compare *Brooks v. Ohio Dept. of Mental Health* (Nov. 14, 1995), Franklin App. No. 95API04–505, 1995 WL 681195.

## TRIAL VISIT

{¶ 76}   55.   The plaintiffs contend that the defendant hospital should have released this patient for a "Trial Visit" pursuant to R.C. 5122.22, instead of discharging him.   The hospital's attending psychiatrist believed that this statutory procedure related solely to forensic psychiatric patients, i.e., patients who are incompetent to stand trial or not guilty by reason of insanity for criminal offenses.   Otherwise, none of the health care professionals who testified in this case had any familiarity with its existence until plaintiffs' counsel brought it to their attention.

{¶ 77}   56.   No evidence showed that this hospital, the Franklin County ADAMH Board, the Bridge, or any other relevant agency developed or maintained any procedures to implement that practice in Franklin County.   Defendant's expert witness (Dr. Gordon Neligh) explained that Ohio's trial-visit statute was probably a vestige of long-abandoned procedures in which in-patient psychiatric hospitals retained involuntary patients indefinitely.

{¶ 78}   57.   While plaintiffs' expert witnesses expressed a preference for a statutory trial visit rather than a discharge, they failed to explain when or how the hospital would implement that procedure for this patient.

{¶ 79}   58.   Without a further probate court order, the ADAMH Board and the defendant hospital would have lost all authority to maintain involuntary control over this patient on August 15, 1995 (see findings 43–44 above), so any

involuntary "trial visit" would end then. No evidence showed whether a trial visit until August 15 would have prevented the patient's violent acts more than three months later.

{¶ 80} 59. The plaintiffs failed to show by a preponderance of the evidence that the defendant hospital acted negligently by discharging this patient instead of releasing him for a statutory trial visit. They also failed to show by a preponderance of the evidence that any decision regarding a trial visit proximately caused the patient's later violent acts.

## POST–DISCHARGE AFTERCARE

{¶ 81} 60. Following this patient's discharge from the defendant hospital, the Bridge provided him out-patient care, which could include case management, psychiatric evaluation and care, medication monitoring, community outreach, psychotherapy, and crisis intervention. An authorized aftercare agency should provide those services when they were appropriate, whether the agency used a single case manager or community treatment team.

{¶ 82} 61. By its own policies and procedures, the Bridge's case manager should have prepared an aftercare treatment plan for this patient within thirty days after his admission to its care on May 22, 1995, while he was still an in-patient. Like the hospital's treatment plan, the aftercare agency's treatment plan should describe the patient's problems and should target goals and objectives for addressing those problems. The Bridge should assess the client's needs, independently of any assessment the hospital makes, including particularly any post-discharge planning.

{¶ 83} 62. The Bridge and its case manager (Lisa Johnson) were responsible for preparing and implementing that treatment plan. The Bridge could and should have changed its treatment plan if the patient's needs changed. Neither the Bridge's case manager nor any other Bridge representative ever prepared a treatment plan for this patient.

{¶ 84} 63. The Bridge could and should have asked the probate court for his involuntary commitment if it ever felt that he met the statutory definition for "a mentally ill person subject to hospitalization by court order," presumably under R.C. 5122.01(B)(2) or (B)(4):

{¶ 85} "(2) Represents *a substantial risk of physical harm to others* as manifested by evidence of *recent* homicidal or other violent behavior, evidence of *recent* threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of *present* dangerousness;

{¶ 86} "(4) Would benefit from treatment in a hospital for his mental illness and is in need of such treatment as manifested by evidence of behavior that creates a *grave and imminent risk to substantial rights of others* or himself."

{¶ 87}   64.  The Bridge's assigned case manager complained to her supervisor that she feared this patient.  If her fears impaired her ability to perform her duties properly, the Bridge should have replaced her as the case manager or provided her with any necessary assistance.

{¶ 88}   65.  The plaintiffs contend that the defendant hospital should have reported her fears to the Bridge and requested the Bridge to provide a different case manager.  The defendant hospital had no authority or duty to determine how or with what personnel the Bridge performed its functions, and the case manager herself reported those fears to her supervisor without any resulting change.  The plaintiffs failed to show by a preponderance of the evidence that the hospital should have requested the Bridge to provide a different aftercare case manager, or that the absence of such a request proximately caused the patient's later violent acts.

{¶ 89}   66.  On the weekend that the hospital discharged him, the Bridge's case manager saw the patient at a festival in downtown Columbus.  He was calm, approached her in a civil manner, and did not appear to her as dangerous.

{¶ 90}   67.  The patient started his employment at Ameritech on July 24, 1995, the Monday after the hospital discharged him.  He never missed a day's work from then until November 5, 1995.

{¶ 91}   68.  The patient's mother and sister-in-law believed that he was taking his medication after the hospital discharged him.  He was calm, quiet, and non-threatening.  He attended a family reunion in August of 1995, where he interacted calmly with children and other family.  There was no evidence that he failed to take his medication while his original thirty-day supply lasted.

{¶ 92}   69.  On August 18, 1995, almost one month after the hospital discharged him and three days after the original probate court commitment order would have expired, the patient briefly visited the hospital's social worker to request more medication.  He told her that he had been taking the prescribed medication and that he needed more.  Although he appeared calm when he arrived, he later became tearful.  The hospital's social worker promptly reported this contact to the Bridge's case manager.

{¶ 93}   70.  The Bridge's case manager then telephoned the patient to ask about his medication supply and to reschedule his appointment with the Bridge's psychiatrist (Dr. Pugliese).  The patient was originally scheduled to see Dr. Pugliese on the same day that the hospital discharged him.  The case manager

had previously spoken to the patient on August 1, 1995, regarding the need to reschedule his missed appointment.

{¶ 94}  71.  On August 25, 1995, more than a month after the hospital discharged this patient and ten days after the original probate court commitment order would have expired, the Bridge's psychiatrist (Dr. Pugliese) examined this patient and evaluated his mental health needs.  Shortly thereafter, the case manager reviewed that psychiatrist's written evaluation and signed it to confirm that she read it.  Neither the Bridge's psychiatrist nor its case manager concluded then that there was any reason to seek a recommitment order from the probate court.  More specifically, the case manager had not heard him express any plans to hurt himself or others.

{¶ 95}  72.  At the August 25 visit, Dr. Pugliese issued a prescription for the patient to obtain an additional supply of medication without any cost to him at a nearby pharmacy.  The evidence lacks clarity about when the patient obtained that additional medication supply and when he ultimately discontinued taking it. · Following the November 18 murders, the police searched his home and found substantial unused supplies of those medications, as well as a substantial supply of caffeine pills.  The evidence failed to show whether the patient consumed caffeine pills after his discharge from the defendant hospital, or whether caffeine pills proximately caused any violent acts.

{¶ 96}  73.  The patient made some efforts to comply with the hospital's aftercare plan.  He asked the Bridge's case manager to schedule his appointments when he was not working and notified her that the doctor appointments she scheduled were at inconvenient times.  Nevertheless, the Bridge case manager continued to schedule his appointments at inconvenient times.  After he had not visited her for two months, she sent him a letter on October 17, which threatened that the Bridge would terminate his treatment there if he did not reestablish contact with it.  Three days later, the patient telephoned her to request further services.  He told her he had been seeing a minister for counseling.

{¶ 97}  74.  On October 19, 1995, the patient ordered a handgun at a local gun store, which he picked up on October 27.  There is no evidence that he reported this acquisition to his family, anyone at the Bridge, or anyone else.

{¶ 98}  75.  On October 23, 1995, the Bridge's case manager discussed her lack of patient contact with the Bridge's psychiatrist (Dr. Pugliese), who told her that the patient needed to meet with her regularly and to take the prescribed medications.

{¶ 99}  76.  On October 30, the Bridge's case manager telephoned the patient and told him that he needed to see the Bridge's psychiatrist (Dr. Pugliese).  The patient agreed and asked her to provide additional medication.  Later that day,

the Bridge's case manager received a call from the patient's mother, in which the mother stated that the patient "desperately" needed his medications because he was acting like he did before he went to the defendant hospital.

{¶ 100}  77.  At the case manager's request, the patient came to see her on October 31.  She then gave him an appointment with the Bridge's psychiatrist for November 10.  On that occasion, the patient picked up the medications that had been waiting for him for many days at the Bridge's own pharmacy.  Though the case manager could check whether a patient obtained medications there, she had not done so for this patient.

{¶ 101}  78.  After the patient visited her on October 31, the Bridge's case manager promptly consulted the Bridge's psychiatrist.  She told the psychiatrist about her conversation with the patient's mother and that there were questions about his medication compliance.  She claims that she tried to schedule an earlier appointment for the patient to see the psychiatrist but was told that the psychiatrist's schedule was fully booked.

{¶ 102}  79.  On October 31, the Bridge's case manager believed that the patient appeared normal and nondangerous.

{¶ 103}  80.  When the patient failed to appear for the scheduled November 10 visit with the Bridge's psychiatrist, the case manager made no effort contact him.

{¶ 104}  81.  On November 14, 1995, the patient's sister-in-law (Cynthia Hessler) called Bank One, where the husband of the patient's former girl friend was employed.  The sister-in-law reported her concern about the patient's increasingly alarming and threatening behavior towards that employee, and that he might harm that employee.

{¶ 105}  82.  There was no evidence that anyone at the defendant hospital had any knowledge about the patient's condition after August 18 (more than three months before his violent acts), or about the patient's mother's call to the Bridge's case manager on October 31, or about the sister-in-law's phone call to Bank One on November 14.

{¶ 106}  83.  The Bridge negligently failed to provide this patient with reasonable care for his mental health condition.

{¶ 107}  84.  On Sunday, November 19, 1995, the patient came to his mother's home in battle dress.  He then drove his car to several locations, where he killed four people and wounded and terrified others.  He reportedly had a misconceived motive for each attack, because he believed that the victims were women who unfairly rejected his relationship, or men who unfairly married those women, or a supervisor who unfairly discharged him from earlier employment.

{¶ 108}   85.   The police promptly apprehended him.   At his murder trial, he did not assert an insanity defense.   He now awaits execution in the state penitentiary▮

## GENERAL CONCLUSIONS

{¶ 109}   86.   The plaintiffs failed to prove by a preponderance of the evidence that the defendant hospital was negligent in a manner that proximately caused their injuries or damages.

▮   {¶ 110}   87.   The Bridge was a fully informed and consciously acting agency, whose negligent conduct the defendant hospital had no reason to anticipate and could not have reasonably foreseen.   The Bridge's negligence was a superseding intervening cause which prevented any conduct by the defendant hospital from being a proximate cause of any plaintiff's injury or damage. *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 6 OBR 209, 451 N.E.2d 815, paragraph one of the syllabus; *Thrash v. U–Drive It Co.* (1953), 158 Ohio St. 465, 49 O.O. 402, 110 N.E.2d 419; *White v. Vrable* (Sept. 30, 1999), Franklin App. No. 98AP–1351, 1999 WL 771053; *Andrews v. Davis* (2000), 140 Ohio App.3d 707, 748 N.E.2d 1195.

{¶ 111}   88.   While the defendant hospital did not always perform its services perfectly, the hospital and its personnel acted in good faith, relying on actual knowledge or information they thought to be reliable, when they participated in and assisted in this patient's hospitalization and discharge.   "After a thorough evaluation of the severity of the propensities and a balancing of the patient's interests and the interests of potential victims, a treatment plan was formulated in good faith which included discharge" of the patient.

{¶ 112}   89.   Accordingly, the defendant hospital and its personnel are immune from liability to these plaintiffs for their actions and decisions regarding this patient's care and discharge.   R.C. 5122.34(A); *Estates of Morgan v. Fairfield Family Counseling Ctr.* (1997), 77 Ohio St.3d 284, 673 N.E.2d 1311; *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 529 N.E.2d 449, syllabus.

{¶ 113}   90.   In general, Ohio's civil commitment procedure is less effective for preventing this type of disaster than criminal prosecutions for prior violent conduct that justifies civil commitment or criminal prosecution.   During criminal prosecutions and after criminal convictions, the judge has greater authority to restrain potentially dangerous persons who are mentally ill and to give psychiatric facilities greater authority to restrain them.

{¶ 114}   91.   Before his involuntary hospitalization, this patient reportedly committed multiple felonies, including felonious assault, aggravated menacing, menacing, domestic violence, vandalism, carrying a concealed weapon, and unlawful possession of dangerous ordnance.

{¶ 115}   92.   If the patient's victimized family, the police, or others had caused him to be prosecuted for one or more of these felonies, the criminal justice system might well have provided better protection for the public than the civil commitment system.   Both systems are fallible, but the law appropriately gives the criminal justice system more power to control dangerous offenders.

Judgment for defendant.

RICHARD M. MARKUS, J., retired, of the Cuyahoga County Court of Common Pleas, sitting by assignment.